UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

OHIO SECURITY INSURANCE COMPANY,

                              Plaintiff,                          25 Civ. 3948 (PAE)

              -v-
                                                                 OPINION & ORDER
ACCIDENT FUND INSURANCE COMPANY OF
AMERICA,

                              Defendant.

---

PAUL A. ENGELMAYER, District Judge:

    Plaintiff Ohio Security Insurance Company ("OSIC"), an insurer, brings this declaratory

judgment action against Accident Fund Insurance Company of America ("AFICA"), another

insurer.  OSIC seeks a declaration that AFICA is obligated to defend non-party Grace

Contracting and Development, LLC ("Grace"), in a New York state-court personal-injury action

arising from work performed by a Grace subcontractor, Pinnacle Thermal Solutions, LLC

("Pinnacle").  OSIC's property and casualty insurance policy covers Grace; AFICA's covers

Pinnacle.  AFICA denies a duty to defend or indemnify Grace in connection with the state-court

suit.

    Pending now are (1) OSIC's motion for partial summary judgment on AFICA's duty to

defend Grace and (2) AFICA's cross-motion for partial summary judgment on AFICA's duty to

defend or indemnify Grace.  For the reasons that follow, the Court grants OSIC's motion and

denies AFICA's cross-motion.

I.    **Background**

    A.    **The Parties**

OSIC is an New Hampshire corporation with its principal place of business in Boston, Massachusetts.  Dkt. 1 ("Compl.") ¶ 3.  OSIC issued an insurance policy to Grace, a New York construction company that hired Pinnacle to renovate ducts for the Tarrytown Union Free School District ("Tarrytown"), located outside Sleepy Hollow, New York.  Dkt. 26 ("JSF") ¶¶ 1–2.

AFICA is a Michigan corporation with its principal place of business in Michigan. Compl. ¶ 4.  AFICA issued Pinnacle a policy, covering May 1, 2023 to May 1, 2024.  JSF ¶ 4.

    B.    **Underlying Facts**[1]

        1.    **The Claimed Injury and Overview of the State Court Action**

In January 2021, non-party Edwin Alonso Caceres Sanchez ("Caceres") began working for Pinnacle installing insulation in commercial and residential buildings.  Dkt. 30-12 ("Caceres

---

[1] The Court draws its account of the underlying facts of this case from the parties' submissions on the competing motions.  These include: (1) in support of OSIC's motion for partial summary judgment, OSIC's memorandum of law, Dkt. 28 ("OSIC Mem."), supporting declaration, and numerous exhibits; (2) in support of AFICA's motion for summary judgment and in opposition to OSIC's motion, AFICA's memorandum of law, Dkt. 32-18 ("AFICA Mem."), supporting declaration, and numerous exhibits; (3) in opposition to AFICA's motion and in further support of its motion, OSIC's reply memoranda, Dkts. 33–34 ("OSIC Reply"), supporting declaration, and exhibits; and (4) in further support of AFICA's motion, AFICA's reply memorandum, Dkt. 37 ("AFICA Reply").  The Court also draws on the parties' joint stipulated facts, Dkt. 26 ("JSF"), and their individual Rule 56.1 statements, Dkt. 31 ("OSIC SMF") and Dkt. 32-16 ("AFICA SMF").

Dep.") at 14.  Caceres contends that, on July 31, 2023, at or around 1:20 to 1:30 p.m., while working on Pinnacle's project at Tarrytown, he sustained injuries from falling off a scaffold he was using to replace insulation in certain vents.  *Id.* at 28; Dkt. 30-1 ("Caceres Compl.") ¶¶ 3–4, 47–48.

On or about January 26, 2024, Caceres commenced a negligence action against Tarrytown in New York State Supreme Court.  JSF ¶ 14.  Later, Caceres joined two additional defendants, Grace and Triton Construction Company LLC—each a construction company awarded a contract for work in Tarrytown.  *See id.* ¶ 15.  On April 30, 2024, Grace answered.  *Id.* ¶ 16.  On or about July 24, 2024, Grace filed a third-party complaint, impleading Pinnacle.  *Id.* ¶ 17.  On August 14, 2024, Pinnacle filed an answer to the third-party complaint.  *Id*. ¶ 18.

### 2.    The Construction Project and Caceres' Accident

On or about April 15, 2022, Grace and Pinnacle began discussions regarding a construction project at Tarrytown.  *Id.* ¶ 1; Dkt. 32-9 at 4–8 ("Purchase Order").  On April 28, 2022, Grace sent Pinnacle a Purchase Order, detailing the scope of work and associated costs of the project.  *See id.*  The Purchase Order identified two aspects to the anticipated construction work: a capital and supplemental project at Tarrytown.  *Id.* at 1.  The project principally involved performing HVAC replacement work at Tarrytown.  JSF ¶ 1.  With respect to subcontractor

---

Citations to a party's Rule 56.1 statement incorporate by reference the materials cited therein. Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and disputed with a conclusory statement absent conflicting testimonial or documentary evidence, the Court finds such facts true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Pinnacle's scope of work, the Purchase Order provided: "[a]ll material, equipment and work must be supplied as per plans, specifications and all addenda, approved submittals and general conditions of the project.  Please note that all plans and specifications and addenda supersede quote."  Purchase Order at 1.

The Purchase Order further specified:

Grace Contracting & Development LLC is to be included as an Additional Insured as respects [sic] work being done on their behalf and they need to show a Cancellation clause such as: 30 day cancellation for non-renewal and 10 day cancellation for non-payment will be provided to certificate holder.

*Id.*

On or about October 17, 2022, Grace and subcontractor Pinnacle executed a contract for the Tarrytown project.  JSF ¶ 1.  The subcontractor agreement contained a specific indemnification clause.  Dkt. 32-9 at 2–3 ("Subcontractor Agreement" or "Agreement").  The Agreement provided:

To the fullest extent permitted by law, SUBCONTRACTOR shall *indemnify, defend and hold harmless Grace*, the owner, the architect, and their agents and employees from and against all claims, damages, losses and expenses, including but *not limited to attorney fees*, arising out of or resulting from the performance of the Work provided that any such claim, damage, loss, or expense (l) is attributed to bodily injury, sickness disease or death or injury to or destruction of tangible property (other than the work itself) including the Joss of use resulting therefore, and (2) is caused in whole or in part by any neglect act or omission of the Contractor, and Subcontractor, anyone directly or indirectly employed by any of them or anyone for whose acts any of them may be liable, *regardless of whether or not it is caused in part by indemnified hereunder,* such obligation shall not be construed to negate, abridge, or otherwise reduce any other right or obligation of indemnity, which would otherwise exist, to any party or person described in this paragraph. Grace Contracting & Development LLC is hereby named as an additional insured on a primary and non-contributory basis which includes your work.

*Id.* at 2 (emphases added).

4

Salient here, the Subcontractor Agreement further stated that Pinnacle "shall purchase and maintain insurance" with enumerated coverage limits. *Id.* This insurance was defined to include commercial general liability insurance, to which Grace was to be added by Pinnacle as an additional insured. *Id.* Per the Agreement, coverage as to the additional insured—Grace—was to "be as broad as coverage provided for [Pinnacle]. It shall apply as Primary Insurance, before any other insurance or self insurance, including deductible, maintained by or provided to [Grace]." *Id.* The duration of this coverage was to be coextensive with the "duration of the project," at Tarrytown and additional coverage was to be secured for Grace "for at least 2 years after completion of the work." *Id.*

In early to mid-July of 2023, pursuant to the Pinnacle-Grace contract, Caceres began installing tubing and air conditioning at Tarrytown. Caceres Dep. at 26. On July 31, 2023, at 7:30 a.m., Caceres reported to a Marriott hotel, where Pinnacle was conducting another HVAC-related project. *Id.* at 28. Approximately half an hour after arriving at the Marriott, Caceres' supervisor from Pinnacle sent him a text directing him to go to Tarrytown and "begin the insulation." *Id.* At 8:40 a.m., Caceres arrived at the Tarrytown site and started working. *Id.* at 27. Around 12:30 to 12:40 p.m., Caceres began to use the scaffold, which was necessary to reach certain ducts. *Id.* at 28, 32. The scaffold, with two wood boards approximately six to seven feet off the ground, was already assembled in the entryway hallway when Caceres arrived at the Tarrytown work site. *Id.* at 27, 35. Between the two boards on the scaffold was a gap of approximately three to five inches. *Id.* at 45. Nothing was securing the boards in place to the scaffold. *Id.* at 44. Caceres testified that there was no one present at Tarrytown for him to ask, or communicate concerns, about the condition of the scaffold: "They just gave us an order to do the work and we can't really make any excuses." *Id.* at 46. That day was the first time Caceres

had to use a scaffold at the Tarrytown project.  *Id.* at 27.  Caceres climbed the scaffold in his Converse high top sneakers using a small ladder affixed to one side of the scaffold.  *Id.* at 32, 36–37.  Caceres was not wearing a hard hat and testified that none was provided at the site.  *Id.* at 38.  Nor was he furnished any type of harness to use while operating on the scaffold: "The boss hadn't given us anything."  *Id.* at 34.  Caceres was wearing a "work shirt" supplied by Pinnacle.  *Id.* at 36–37.

Once on the scaffold, Caceres began insulating pipes at the top of a wall connected to a series of ducts.  *Id.* at 33.  This required him first to measure the pipes and then to carefully use a knife to cut a roll of insulation into pieces that fit, and which he stacked on the scaffold.  *Id.* at 39.  Eventually, Caceres cut several pieces of insulation, placing the pieces next to him on the scaffold in preparation for insulating the pipes.  *Id.* at 41.  Caceres alleges that between 1:20 and 1:30 p.m., as he was working on placing the insulation, one of the two boards on the scaffold slipped from left to right and moved from beneath his feet.  *Id.* at 28, 42–43.  He then fell off the scaffold, hitting his back, knees, shoulder, right wrist, and head.  *Id.* at 42–44.  He contends he lost consciousness for several minutes before emergency services arrived and took him to a hospital.  *Id.* at 47.

### 3.    The Insurance Policies and Tender

The parties' indemnification dispute implicates several insurance policies and certificates of liability.

***Grace's policy with OSIC***:  The insurance policy OSIC issued to Grace provided Grace with "commercial general liability coverage" for July 21, 2023 to April 1, 2024.  JSF ¶ 2; Dkt. 29-1 ("OSIC Policy").  Only Grace—not Pinnacle—qualifies as a Named Insured (a person or entity to whom OSIC explicitly extends coverage under the policy).  *See id.* ¶¶ 3–4.  Subject to

certain terms, conditions, and exclusions, the OSIC Policy provides coverage for bodily injury that takes place during the policy period and is caused by an accident.  OSIC Policy at 90–91. The OSIC Policy contains an endorsement that "we will have no duty to defend the insured against any 'suit' seeking" damages for personal injuries, "to which this insurance does not apply."  *Id.* at 95.  The policy further disclaims any obligation for damages "in excess of the applicable limit of insurance," which may be incurred pursuant to legal action against a covered party.  *Id.* at 101.  As to excess coverage, the policy contains an endorsement that, under certain terms and conditions, limits its obligations as follows:

> b. Excess Insurance
>
> (1)    This insurance is excess over: . . . .
>
> (b)    Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.
>
> (2)    When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any 'suit' if any other insurer has a duty to defend the insured against that 'suit' . . . .

JSF ¶ 3.

*Pinnacle's policy with AFICA*:  The insurance policy AFICA issued to Pinnacle (the "AFICA Policy" or "AFICA Primary Policy") provides Pinnacle with "commercial general liability coverage" for the period of May 1, 2023 to May 1, 2024.  *Id.* ¶¶ 4–5 (cleaned up).  Only Pinnacle—not Grace—qualifies as a Named Insured under the AFICA Policy.  *Id.*  The AFICA Primary Policy provides that it is "primary except when Paragraph b. below applies.  If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary."  *Id.* ¶ 7.  The policy contains a further endorsement that:

> Notwithstanding the provisions of subparagraphs a, b, and c of this paragraph 4, with respect to the Entity shown above, it is understood and agreed that in the event of a claim or 'suit' arising out of the Named Insured's negligence, this insurance shall be primary and any other insurance maintained by the Entity above shall be excess and non- contributory.
>
> The Entity to whom this endorsement applies is:
>
> Absence of a specifically named Entity above means that the provisions of this endorsement apply 'as required by Written contractual agreement with any Entity for whom you are performing work.'

*Id.* ¶ 8.

As to the duty to defend, the AFICA Primary Policy contains two relevant endorsements. The first is titled "Additional Insured—Owners, Lessees[,] or Contractors—Scheduled Person or Organization" (the "AFICA AI Endorsement" or "AI Endorsement").  *Id.* ¶ 6.  It provides that coverage as to Pinnacle was amended to include as an additional insured any organization as "required by written contract, signed and executed prior to a loss."  *Id.*  In such situations, "an additional insured" is to include an organization whose liability is caused "in whole or in part" by "[Pinnacle's] acts or omissions" or "[t]he acts or omissions of those acting on [Pinnacle's] behalf" during "the performance of [Pinnacle's] ongoing operations for the additional insured(s) at the location(s) designated above."  *Id.*  Finally:

> If coverage provided to the additional insured is required by contract or agreement, the insurance afforded to such additional insured will not be broader than that which [Pinnacle is] required by the contract or agreement to provide for such additional insured.

*Id.*

The second is titled "New York Changes – Commercial General Liability Coverage Form."  This extended, under certain terms and conditions, the obligation to pay:

> [t]hose sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those

damages even if the allegations of the 'suit' are groundless, false or fraudulent. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply. We may, at our discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result . . . .

*Id.* ¶ 5. It specified that "this insurance applies to 'bodily injury'" only if:

(1)    The 'bodily injury'. . . is caused by an 'occurrence' that takes place in the 'coverage territory'; and

(2)    The 'bodily injury'. . .occurs during the policy period.

*Id.* Bodily injury, in turn, is defined as "sickness or disease sustained by a person, including death resulting from any of these at any time." *Id.* And "occurrence" refers to an accident, to include "continuous or repeated exposure to" certain harmful conditions. *Id.*

**Pinnacle's commercial excess policy with AFICA**: Finally, AFICA issued a commercial excess policy to Pinnacle (the "AFICA Excess Policy"), which broadly tracked the "same provisions, exclusions and limitations" of the "controlling underlying insurance." *Id.* ¶ 11. "[C]ontrolling underlying insurance," in turn, refers to the "policies identified in a schedule in the declarations of the policy." *Id.* ¶ 12. This policy provided that:

We will pay on behalf of the insured the 'ultimate net loss' in excess of the 'retained limit' because of 'injury or damage'' to which insurance provided under this Coverage Part applies.

We will have the right and duty to defend the insured against any suit seeking damages for such 'Injury or damage' when the applicable limits of 'controlling underlying insurance' have been exhausted in accordance with the provisions of such 'controlling underlying insurance.'

*Id.* ¶ 11.

The excess policy also contained an amendment endorsement. *Id.* ¶ 13. Salient here, it stated that AFICA's insurance is "excess over any other insurance available" *except* "[i]nsurance

9

available to the person or organization shown in the schedule of this endorsement as an additional insured on the 'controlling underlying insurance.'" *Id.*

On various occasions between March 2024 and the present, OSIC tendered to AFICA— *i.e.*, demanded that AFICA provide coverage on behalf of Grace—in connection with Caceres' state-court action. OSIC has sought both defense and indemnification for Grace under the AFICA Policy. *See, e.g.*, Dkt. 29-2 at 13 (notifying Pinnacle of intent to "exert a tender upon Pinnacle if a suit is filed against" Grace due to Pinnacle's obligation to provide "additional insurance coverage to Grace"). AFICA has denied that it has an obligation to defend or indemnify Grace in connection with Caceres' state-court action. *See* AFICA Mem. at 20–23.

### C.    Procedural History of This Action

On May 12, 2025, OSIC initiated this declaratory judgment action. *See* Compl. On June 6, 2025, AFICA answered. Dkt. 10. On July 10, 2025, the Court held an initial conference, *see* Dkt. 11, and issued a case management plan and scheduling order, Dkt. 22. On August 15, 2025, OSIC filed a letter anticipating a motion for partial summary judgment. Dkt. 23. On September 2, 2025, the Court held a pre-motion conference, *see* Dkt. 24, and set a briefing schedule for the instant motions, Transcript of Sept. 2, 2025 Conference at 9–11.

On September 8, 2025, the parties filed a joint statement of stipulated facts. Dkt. 26. On September 15, 2025, OSIC moved for partial summary judgment. Dkts. 28–31. On September 22, 2025, AFICA cross-moved for summary judgment and opposed OSIC's motion. Dkt. 32. On September 29, 2025, OSIC replied to AFICA's motion. Dkts. 33–36. On October 6, 2025, AFICA replied to OSIC's motion. Dkt. 37.

10

## II.    Applicable Legal Standards and Principles

### A.    Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating that no genuine issue respecting any material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *see also Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017). In making this determination, the Court must view all facts "in the light most favorable" to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (cleaned up).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (cleaned up). Rather, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

11

### B.    Interpreting Insurance Policies Under New York Law

New York law governs interpretation of the policies at issue.  *See* OSIC Mem. at 7 n.1;

AFICA Mem. at 17.  "The construction of an insurance contract is ordinarily a matter of law to

be determined by the court."  *U.S. Underwriters Ins. Co. v. Affordable Hous. Found., Inc.*, 256 F.

Supp. 2d 176, 180 (S.D.N.Y. 2003) (citing *Town of Harrison v. Nat'l Union Fire Ins. Co.*, 89

N.Y.2d 308, 316 (1996)).  In resolving a summary judgment motion involving contract

interpretation, "a court should accord [contract] language its plain meaning giving due

consideration to the surrounding circumstances and apparent purpose which the parties sought to

accomplish."  *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 187 (2d Cir. 2006) (quoting *Thompson

v. Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990)).

When contract language is unambiguous, "the district court [may] construe it as a matter

of law and grant summary judgment accordingly."  *Id.* (quoting *Thompson*, 896 F.2d at

721).  But, if policy language is ambiguous, New York law provides that such ambiguities must

be construed in favor of the insured and against the insurer.  *See Duane Reade, Inc. v. St. Paul

Fire & Marine Ins. Co.*, 600 F.3d 190, 201 (2d Cir. 2010); *Handelsman v. Sea Ins. Co.*, 85

N.Y.2d 96, 101 (1994) ("Where there is ambiguity as to the existence of coverage, doubt is to be

resolved in favor of the insured and against the insurer.").

Whether a contract is ambiguous is a threshold question of law for the court.  *Parks Real

Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006).

"Language in an insurance contract will be deemed ambiguous if reasonable minds could differ

as to its meaning."  *Haber v. St. Paul Guardian Ins. Co.*, 137 F.3d 691, 695 (2d Cir. 1998).  The

Second Circuit has explained that "ambiguity exists where the terms of an insurance contract

could suggest 'more than one meaning when viewed objectively by a reasonably intelligent

12

person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000) (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997)).

Where the language of a contract is held ambiguous, the factfinder may properly consider "extrinsic evidence as to the parties' intent." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009) (cleaned up); *see also Collins v. Harrison–Bode*, 303 F.3d 429, 433–34 (2d Cir. 2002) ("[W]here . . . there are internal inconsistencies in a contract pointing to ambiguity, extrinsic evidence is admissible to determine the parties' intent." (cleaned up)). "Where there is such extrinsic evidence, the meaning of the ambiguous contract is a question of fact for the factfinder." *JA Apparel Corp.*, 568 F.3d at 397 (citing *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000); *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 574 (2d Cir. 1993)); *accord Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000); *U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 875 F.2d 1044, 1048 (2d Cir. 1989) ("In determining the meaning of an ambiguous contract term, the finder of fact seeks to fathom the parties' intent. That intent may be proven by extrinsic evidence[.]").

## III.    Discussion

OSIC, the insurer of general contractor Grace, argues that it is entitled to a declaration that AFICA, the insurer of subcontractor Pinnacle, is obligated to defend Grace in the underlying personal injury action, and that AFICA's obligation is primary to OSIC's coverage obligation. AFICA seeks a declaration that it owes neither a duty to defend nor to indemnify Grace in the underlying action. The parties thus take opposite positions on whether AFICA has a duty to

13

defend Grace, while AFICA also moves on the duty to indemnify.  In the event OSIC prevails in establishing that AFIC had a duty to defend Grace, AFICA seeks an inquest as to the "materiality, necessity and reasonableness of defense fees [OSIC] incurred" in the underlying action.  AFICA Mem. at 30–31.

These motions turn on (1) whether Grace qualifies as an additional insured under the AFICA Policy; and (2) if so, as between the AFICA and OSIC policies, which entity's coverage obligations are primary.

### A.      Whether AFICA's AI Insured Endorsement Requires It to Defend Grace

Whether Grace qualifies as an additional insured turns on the AFICA Policy and, specifically, the AI Endorsement.  OSIC argues that Grace is entitled to coverage under the AFICA Policy.  OSIC Mem. at 5.  AFICA argues the opposite, on the ground that, because Pinnacle did not own, control, or place the scaffold from which Caceres fell, no act or omission by Pinnacle could have caused the underlying accident, and, therefore, Grace is not an additional insured to whom AFICA owes a duty to defend.  AFICA Mem. at 20–21.

The Court holds that AFICA has a duty to defend Grace under the AFICA Policy.

### 1.      Role of Extrinsic Evidence in Determining a Duty to Defend

An insurer's "duty to defend is exceedingly broad."  *Auto. Ins. Co. of Hartford v. Cook*, 7 N.Y.3d 131, 137 (2006) (quoting *Continental Cas. Co. v. Rapid-American Corp.*, 80 N.Y.2d 640, 648 (1993)).  In general, "[t]he duty to defend is measured against the allegations of pleadings." *Euchner-USA, Inc. v. Hartford Cas. Ins. Co.*, 754 F.3d 136, 140 (2d Cir. 2014) (cleaned up). "[A]n insurer will be called upon to provide a defense whenever the allegations of the complaint 'suggest ... a reasonable possibility of coverage.'"  *Id.* at 141 (quoting *Auto. Ins. Co. of Hartford*, 7 N.Y.3d at 137).  "If, liberally construed, the claim is within the embrace of the policy, the insurer must come forward to defend its insured no matter how groundless, false or baseless the

14

suit may be." *Auto. Ins. Co. of Hartford*, 7 N.Y.3d at 137 (quoting *Ruder & Finn v. Seaboard Sur. Co.*, 52 N.Y.2d 663, 670 (1981)).  Any "doubt as to whether the allegations state a claim within the coverage of the policy must be resolved in favor of the insured and against the carrier." *Brook Shopping Ctr. v. Liberty Mut. Ins. Co.*, 439 N.Y.S.2d 10, 12 (1st Dep't 1981).

"[T]he general rule in determining whether an insurer has a duty to defend is to compare the allegations of the complaint with the operative insurance policy." *Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 148 (2d Cir. 2004).  But a well-recognized exception to this "four corners of the complaint" rule permits a court, in certain circumstances, to draw upon extrinsic evidence in making coverage determinations.  *See 622 Third Ave. Co. LLC. v. Nat'l Fire Ins. Co. et al.*, 646 F. Supp. 3d 466, 475–76 (S.D.N.Y. Dec. 16, 2022).  New York law has not delineated the full range of these circumstances, but consideration of such evidence has been held proper in workplace injury-related actions brought by an employee.  *Stein v. N. Assur. Co. of Am.*, 617 F. App'x 28, 31 n.4 (2d Cir. 2015) (summary order); *See Fitzpatrick v. Am. Honda Motor Co.*, 78 N.Y.2d 61, 66 (1991).  There is a "particularly acute" justification for not "wooden[ly] appl[ying]" the "four corners of the complaint" rule in these circumstances, because New York law generally bars tort actions against the employer, steering the employee instead to statutory no-fault workers' compensation.  *See id.* (cleaned up); N.Y. Workers' Comp. Law § 29(6).  As a result, an employee who brings a tort claim can sue only third parties, and may have little incentive to plead facts implicating his employer.  But, in assessing whether an insurer had a duty to defend the third party as an "additional insured" under its policy, those facts may be central.

Accordingly, "due to the commercial necessity that additional insureds be able to utilize the duty to defend contemplated by the policies relevant to particular business transactions, the

15

use of extrinsic evidence to assess whether the coverage could potentially be triggered is necessary and justified." *Travelers Prop. Cas. Co. v. Harleysville Worcester Ins. Co.,* 685 F. Supp. 3d 187, 207 (S.D.N.Y. 2023). Applying this doctrine, courts have sustained the claims of coverage by additional insureds who based their arguments that a named insured employer was liable on evidence extrinsic to the plaintiff's complaint. *See, e.g.*, *Charter Oak Fire Ins. Co. v. Zurich Am. Ins. Co.*, 462 F. Supp. 3d 317, 325–26 (S.D.N.Y. 2020) (holding, based on extrinsic evidence, that insurer had duty to defend additional insured building owner under policy of named insured contractor who employed the plaintiff who claimed an on-site injuries, *id.* at 326); *City of New York v. Wausau Underwriters Ins. Co.*, 45 N.Y.S.3d 3, 10–11 (1st Dep't 2016) (holding, based on extrinsic evidence, that insurer had duty to defend additional insured based on the insurance policy of subcontractor who employed plaintiff who claimed injuries from street lighting project); *Fitzpatrick*, 78 N.Y.2d at 66–69 (finding duty to defend, notwithstanding that "the complaint on its face did not state a covered claim," *id.* at 69, where the underlying facts known to the insurer by its insured unquestionably involved a covered event).

In this case, consideration of extrinsic evidence is likewise proper. Subcontractor Pinnacle was Caceres' employer. Under New York law, Caceres was precluded from bringing a tort action against Pinnacle, from whom he was limited to workers' compensation relief.[2] But that did not preclude him from bringing tort claims against other entities, including Grace, the general contractor that retained Pinnacle and that is claimed as an additional insured under Pinnacle's policy with AFICA. This Court's charter here thus is not to look myopically at whether Caceres' complaint named Pinnacle or describes tortious conduct by named insured

---

[2] OSIC represents that Caceres has been paid $27,271.53 in workers' compensation benefits for lost earnings and $25,869.34 in medical benefits. *See* Dkt. 29-2 at 12.

Pinnacle.  Instead, the operative question is whether there is a reasonable possibility that Pinnacle's acts or omissions proximately caused Caceres' injuries and whether AFICA has "actual knowledge of facts demonstrating that the lawsuit does involve [a covered] occurrence." *Id.* at 63.  The answers, as developed below, are yes, such that AFICA has a duty to defend.

### 2.    Application of AFICA's AI Endorsement

AFICA's AI Endorsement extends coverage to an additional insured "[w]here required by written contract" as to liability claims arising from a "bodily injury" caused, "in whole or in part" by the named insured's "acts or omissions."  JSF ¶ 6.  The AFICA AI Endorsement thus imposes a duty to defend Grace in Caceres' state-court action if (1) such was "required by [a] written contract" and (2) Caceres' bodily injury, as alleged, was caused "in whole or in part" by acts or omissions" by named insured Pinnacle.

The contractual requirement is easily satisfied.  The Subcontractor Agreement between Pinnacle and Grace names Grace "as an additional insured on a primary and non-contributory basis."  Subcontractor Agreement at 1.  That agreement implemented Pinnacle's commitment, at the time of the Purchase Order, that "Grace Contracting & Development LLC is to be included as an Additional Insured [of Pinnacle] as respects [sic] work being done on their behalf." Purchase Order at 1.  Treating Grace as an additional insured of Pinnacle is thus "required by written contract."  JSF ¶ 6.

The requirement that Pinnacle's "acts or omissions" were responsible "in whole or in part" for Caceres' alleged injuries requires an examination of his factual allegations.  AFICA's denial that any act or omission by Pinnacle caused Caceres' injuries, AFICA Mem. at 21–23; JSF ¶ 6, faces headwinds under New York law, in that a duty to defend is construed liberally, with any doubt resolved in favor of the insured, *Westview Assocs. v. Guar. Nat'l Ins. Co.*, 95

N.Y.2d 334, 340 (2000), and the term "in whole or in part" also sweeps broadly, with even partial responsibility by the named insured triggering the duty to defend. *Burlington Ins. Co. v. N.Y.C. Transit Auth.*, 29 N.Y.3d 313, 322–23 (2017) (contrasting coverage under such an endorsement with coverage under narrow endorsements for acts "solely caused by" the named insured, *id.* at 322); *see also Starr Indem. & Liab. Co. v. Excelsior Ins. Co.*, 516 F. Supp. 3d 337, 348–49 (S.D.N.Y. 2021) (coverage for acts caused "in whole or in part" by the named insured applies to any circumstance "where the named insured is more than 0% liable for the underlying plaintiff's injuries," *id.* at 349). AFICA is thus wrong to depict its coverage as turning on whether Pinnacle was solely responsible for the accident. *See* AFICA Mem. at 20 (claiming it has a duty to defend "only when the damages are *the result* of the named insured's negligence, or some other act or omission" (emphasis added)). Rather, coverage under a policy running to acts or omissions that "in whole or in part" were responsible for the injury applies if "there be a '*reasonable possibility*' that [the named insured]'s acts or omissions were the proximate cause of the injury." *Zurich Am. Ins. Co. v. XL Ins. Am. Inc.*, 547 F. Supp. 3d 381, 399 (S.D.N.Y. 2021) (emphasis added). AFICA also heavily relies on the fact that Caceres did not name Pinnacle as a defendant in the underlying complaint, such that the complaint, within its "four corners," does not support OSIC's bid for its coverage. AFICA Mem. at 21–22. But, as noted, that argument overlooks precedent authorizing a court to consider facts beyond the pleadings in determining whether a duty to defend by an employer's carrier exists where the employee brings tort claims arising from a workplace injury. *See Stein*, 617 F. App'x at 31 n. 4.[3]

---

[3] For this reason, AFICA's argument that Caceres' "complaint allegations are cryptic and blunderbuss," AFICA Mem. at 21, and OSIC's attempt to ascribe liability to Pinnacle is no more than a "fanciful theor[y]," *id*. at 24, ignores case law allowing the Court to look beyond the complaint. *See City of New York*, 45 N.Y.S.3d at 10–11; *see also Travelers Prop. Cas. Co.*, 685

Here, there is solid extrinsic evidence reasonably supporting that acts or omissions by Pinnacle were a proximate cause of Caceres' injury.  In particular, Pinnacle was cited and fined by the United States Occupational Safety and Health Administration ("OSHA") for using an improper scaffold on July 31, 2023, the day of Caceres' scaffold accident.  Dkt. 30-18 ("OSHA Inspection Detail").  That day, following the accident, a certified health and safety official conducted an in-person examination at Tarrytown, identifying "one-tier tubular welded frame scaffold on site not equipped with base plate, mud sills or other adequate firm foundation which was used by the injured worker."  OSHA Inspection Detail at 5.  And, beginning two days later, on August 2, 2023, OSHA began contacting Pinnacle employees to gather information and documents as part of an investigation.  Dkt. 30-13 ("Gilboy Dep. 1") at 35; Dkt. 30-14 ("Gilboy Dep. 2") at 1–3.  Based on its investigation, OSHA concluded that Pinnacle's use of the scaffold had violated governing regulations, in that "[t]he locking pins [for the scaffold] were not in an upright position which would secure the cross braces into place." OSHA Inspection Detail at 8.  Based on that finding, OSHA fined Pinnacle $15,626 in connection with Caceres' accident.  *Id.* at 3.  In a deposition in Caceres' state court case, a consultant for Pinnacle's parent company conceded that OSHA had found a "serious" violation by Pinnacle in connection with Caceres' use of the improper scaffold, and that Pinnacle did not challenge that finding.  Gilboy Dep. 2 at 2–3.

There is also a solid contractual basis on which to reasonably find Pinnacle accountable, in whole or part, for the scaffold deficiencies.  Under its agreement with Grace, subcontractor Pinnacle agreed to "take all reasonable safety precautions," for the work at Tarrytown.  OSIC

---

F. Supp. 3d at 207; *Charter Oak Fire Ins. Co.*, 462 F. Supp. 3d at 326–27; *Fitzpatrick*, 78 N.Y.2d at 63.

SMF ¶ 2. This included "complying . . . with all applicable laws, ordinance, rules, regulations, and orders of any public authority for the safety of persons." *Id.* Courts have cited such contractual safety provisions in cases finding, for an employer's insurer, a duty to defend against tort claims arising from workplace injuries. *See Travelers Indem. Co. v. Accredited Sur. & Cas. Co.*, No. 21 Civ. 3412, 2022 WL 16722107, at *6 (S.D.N.Y. Nov. 4, 2022) ("The duty to defend is triggered when the insured party has safety obligations at the injury site"); *Travelers Prop. Cas. Co.*, 685 F. Supp. 3d at 210–11 (citing such language in a purchase order as a basis to apply "the duty to defend" and noting "the general notion" that an insurer's duty to defend is "exceedingly broad," *id.* at 211).

OSIC marshals additional evidence in support of its claim of a reasonable possibility that a Pinnacle act or omission caused, at least in part, Caceres' injuries. Evidence adduced in discovery in the state-court case supports that Pinnacle sent Caceres to the Tarrytown worksite, defined the scope of work he was to perform, and received daily work site reports, and that Caceres performed his work while wearing a Pinnacle-issued uniform. Caceres Dep. at 26–28, 36–37, 46; Dkt. 30-16 ("Gilboy Dep. 4") at 15–16. As to the scaffolding work he was doing on July 31, 2023, Caceres testified that Pinnacle "just gave us an order to do the work." Caceres Dep. at 46. Caceres' testimony also left a clear implication of fault on Pinnacle's part. He testified that Pinnacle did not provide him with a hard hat or a harness for the scaffold, and his boss at Pinnacle "hadn't given us anything." *Id.* at 38. A consultant for Pinnacle's parent company testified during the state-court proceedings that Pinnacle had also received daily work site reports from Tarrytown. Gilboy Dep. 4 at 15–16. Although no report was prepared on the day of the alleged accident, these reports speak to Pinnacle's supervisory authority. *See City of New York*, 45 N.Y.S.3d at 9 (named insurer's possession of maintenance log, which would have

20

tended to identify mechanical failures alone was sufficient to establish "a reasonable possibility that [the underlying claim] was within the. . . Policy's indemnity coverage").

AFICA makes factual counterarguments.  It cites evidence that Pinnacle did not own or construct the scaffold or move it into position on July 31, 2023.  AFICA Mem. at 20–21.  And it notes Caceres' deposition testimony that the scaffold was in place at the time he arrived.  *Id*. at 21.  AFICA is correct that it is as-yet indeterminate which entity or entities are legally responsible for Caceres' injuries.  But the issue before this Court is not the outcome of Caceres' tort claims, which will be decided in the state-court action, or the ultimate determination of indemnification, which is premature to resolve (and on which OSIC does not move).  It is the threshold one of a duty to defend.  And on the facts at hand, there is quite clearly a "reasonable possibility" that acts or omissions of named insured Pinnacle were a proximate cause of Caceres' injury.  *Travelers Prop. Cas. Co.*, 685 F. Supp. 3d at 208 (cleaned up); *accord Zurich Am. Ins. Co.*, 547 F. Supp. 3d at 399.[4]

---

[4] *Ohio Sec. Ins. Co. v. Traveler's Indem. Co. of Connecticut*, 2021 WL 797670 (S.D.N.Y. Mar. 1, 2021), on which AFICA relies, is factually inapposite.  There, the district court held that a general contractor was not entitled to coverage as an additional insured where the evidence showed that the worksite injury—in which an employee tripped over a floor covering—was attributable to a temporary floorboard installed not by the insured but by the general contractor itself.  *Id*. at *1–2.  There is no analogous showing here that Grace caused the improper installation of the scaffold, let alone that it did so acting alone (*i.e.*, to the exclusion of named insured Pinnacle).  And Caceres' injuries arose from his work on the improper scaffold, the safety of which, as explained, was a contractual responsibility of Pinnacle.

For much the same reason, *Hanover Ins. Co. v. Philadelphia Indem. Ins. Co*., 73 N.Y.S.3d 549, 550 (2018), is inapposite.  There, the district court denied a bid by the insurer of a Manhattan music school to have the school's tort defense covered by the insurer of the security guard contractor who claimed that he had slipped on a freshly mopped floor.  *Id.*  The First Department held that the music school could not avail itself of the security company's insurance, because "the sole proximate cause of the injury [had been] the additional insured [the music school]."  *Id.* at 588.  On the record at hand, the same cannot be said of Grace here.

Grace is thus covered by the AFICA AI Endorsement.  Subject to a determination of whether AFICA's or OSIC's policy is primary, AFICA has a duty to defend Grace.

**B.      Whether AFICA's Coverage is Primary to OSIC's Coverage**

Having determined that AFICA's policy covers Grace in connection with Caceres' claims, the Court considers whether AFICA's, or OSIC's, coverage is primary.

"Where the same risk is covered by two or more policies, each of which was sold to provide the same level of coverage (as is the case here), priority of coverage . . .  is determined by comparison of their respective other insurance clauses." *Charter Oak Fire Ins. Co.*, 462 F. Supp. 3d at 327 (quoting *Sport Rock Intern., Inc. v. Am. Cas. Co.*, 878 N.Y.S.2d 339, 344 (1st Dep't 2009)).  "Where, based on the Other Insurance provisions of the policies at issue, one party's policy is primary with respect to the other policy, then the party issuing the primary policy must pay up to the limits of its policy before the excess coverage becomes effective." *Emps. Ins. Co. of Wausau v. Harleysville Ins. Co.*, 759 F. Supp. 3d 344, 358 (E.D.N.Y. 2024) (cleaned up).

The plain language of both insurance policies makes clear that AFICA's policy is primary.  OSIC's policy states that it is excess to any primary insurance available to Grace.  JSF ¶ 3.  That provision expressly covers claims for damages arising out of operations for which Grace has been added as an additional insured.  *Id*. ¶¶ 4–5.  AFICA's Primary Policy, in turn, states that it is primary, and that this condition is displaced only if another insurance is *also* primary.  *Id.* ¶ 7.  It further states that "in the event of a claim or 'suit' arising out of the Named Insured's negligence, this insurance shall be primary and any other insurance maintained by the Entity above shall be excess and non-contributory." *Id.* ¶ 8.  AFICA's Excess Policy is to the same effect.  That policy states that it is excess over any other insurance except to that insurance

available to an additional insured. *Id.* ¶ 13. As such, the AFICA policy is primary to the OSIC policy. *See, e.g.*, *Liberty Mut. Ins. Corp. v. New York Marine & Gen. Ins. Co.*, 505 F. Supp. 3d 260, 277–79 (S.D.N.Y. 2020) (insurer had duty to defend party as additional insured and that policy provided primary coverage), *on reconsideration in part*, 590 F. Supp. 3d 597 (S.D.N.Y. 2022); *Charter Oak Fire Ins. Co.*, 462 F. Supp. 3d at 327–30 (interpreting near identical provisions to AFICA's Primary and Excess Policy to mean that such policy was primary); *Emps. Ins. Co. of Wausau*, 759 F. Supp. 3d at 358 (same).

The Court accordingly grants OSIC's motion for summary judgment with respect to the duty to defend, and denies AFICA's motion for summary judgment on that point.

### C.    AFICA's Motion for Partial Summary Judgment as to its Duty to Indemnify

AFICA separately moves for summary judgment on whether it has a duty to indemnify Grace.

Under New York law, an insurer's duty to indemnify is "distinctly different" from the duty to defend. *Servidone Const. Corp. v. Sec. Ins. Co. of Hartford*, 64 N.Y.2d 419, 424 (1985). An insurer's duty to defend is properly resolved early in the litigation and is "far more expansive than the duty to indemnify its insured." *High Point Design, LLC v. LM Ins. Corp.*, 911 F.3d 89, 94 (2d Cir. 2018) (cleaned up). In contrast, the insurer's duty to indemnify, including as to an additional insured, is resolved not based on the pleadings but on facts later developed.

"Generally, because a duty to indemnify is based on the facts established at trial and the theory under which judgment is actually entered in a case, it is often premature to issue a declaratory judgment as to the duty to indemnify before the basis for liability is established." *Pac. Emps. Ins. Co. v. St. Francis Care, Inc.*, 729 F. App'x 129, 130 (2d Cir. 2018) (summary order) (cleaned up). As a result, courts generally decline to resolve claims for indemnification,

23

where such a finding would be premature with a final judgment not having been reached. *See, e.g.*, *Travelers Prop. Cas. Corp. v. Winterthur Int'l*, No. 02 Civ. 2406, 2002 WL 1391920, at *6 (S.D.N.Y. June 25, 2002) (duty to indemnify "turns not on the allegations of the complaint but on the actual liabilities as borne out by the facts," which may not be fully developed before a settlement or judgment); *Certain Underwriters at Lloyd's, London v. St. Joe Minerals Corp.*, 90 F.3d 671, 676 (2d Cir. 1960) (finding a declaratory judgment indemnification claim not ripe for resolution where a possibility exists "that at a future time a more complete development of the facts might lead to a different result"); *Lafarge Canada Inc. v. Am. Home Assurance Co.*, No. 15 Civ. 8957, 2018 WL 1634135, at *5 (S.D.N.Y. Mar. 31, 2018) ("[a] central concern is often the level of factual investigation that a premature indemnification ruling would require"); *Atl. Cas. Ins. Co. v. Value Waterproofing, Inc.*, 918 F. Supp. 2d 243, 261 (S.D.N.Y.) ("Courts are concerned about becoming entrenched in a factual quagmire that has yet to be resolved in the underlying litigation."), *aff'd sub nom. Atl. Cas. Ins. Co. v. Greenwich Ins. Co.*, 548 F. App'x 716 (2d Cir. 2013) (summary order).

Separate from this inquiry, a declaration on the duty to indemnify may also be ill-advised when such a determination would encroach on the state court's jurisdiction to determine liability in the underlying the action. Although AFICA has a duty to defend Grace in the lawsuit brought by Caceres, it is premature to determine whether AFICA will have a duty to indemnify Grace. Grace has implead Pinnacle as a third party, and there are outstanding summary judgment motions in the underlying state court action. *See Edwin Alonso Caceres Sanchez v. Tarrytown Union Free School District et al.*, No. 56277/24 (N.Y. Sup. Ct. Dec. 23, 2025), Dkts. 201–03. It is unclear whether Grace will be found liable. And if it is found liable, because Grace has implead the named insured Pinnacle, it may seek to shift responsibility to Pinnacle. Thus, not

24

only does this Court lack the factual basis at this juncture to resolve AFICA's indemnification claim – a ruling on such a claim here could potentially interfere with—or have *res judicata* implications for—the state court's handling of the claims before it.

The Court, therefore, denies AFICA's motion for summary judgment on the duty to indemnify. *See, e.g.*, *Travelers Prop. Cas. Co.*, 685 F. Supp. 3d at 216 (denying partial summary judgment motion on duty to indemnify so as to avoid *res judicata* issues); *Travelers Indem. Co.*, 2022 WL 16722107, at *8 (same where the undisputed facts did not definitively resolve whether insurance policy actually applies); *Lafarge Canada Inc.*, 2018 WL 1634135, at *5 (although "[t]here is no *per se*" rule that underlying liability must be established before a court may rule on a declaratory action, courts, to establish the duty to indemnify "regularly require the existence of liability before exercising [declaratory judgment] discretion over indemnity issues" (cleaned up)).

The Court therefore denies, at this early stage, AFICA's summary judgment motion on the duty of indemnification.

**CONCLUSION**

For the reasons set out above:

The Court, on AFICA's duty to defend Grace in connection with Caceres' underlying state-court personal-injury action, grants OSIC's motion for summary judgment and denies AFICA's cross-motion for summary judgment. The Court issues a declaration that AFICA has a duty to defend Grace in connection with that lawsuit.[5]

---

[5] The Court declines AFICA's request for an inquest at this point as to the fees and costs OSIC has incurred in defending the case while AFICA improperly declined to do so. AFICA Mem. at 30–31. OSIC represents that, as of July 24, 2025, it incurred $44,491.19 defending the underlying action and has documented these payments. OSIC Mem. at 10. It is premature, at this stage, to assess the reasonableness of these fees and expenses. Where total fees and

Separately, the Court denies AFICA's motion for summary judgment on its duty to indemnify Grace in the underlying personal-injury state-court action. The denial is without prejudice to the parties' ability to litigate the duty to indemnify at a later point, on a complete factual record.

The Clerk of Court is respectfully directed to terminate all pending motions.

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: January 6, 2026
        New York, New York

---

expenses are not final, and a full record of the matter is not yet in hand, courts generally have declined to assess the reasonableness of fees. *See, e.g.*, *Ohio Sec. Ins. Co. v. Utica First Ins. Co.*, 795 F. Supp. 3d 466, 474–75 (S.D.N.Y. 2025) (declining, upon determination of a duty to defend, to order inquest as to fees thus far incurred; the Court notes that there had not been a final resolution of the underlying action); *Travelers Indem. Co. of Am. v. Sw. Marine & Gen. Ins. Co.*, No. 21 Civ. 1828, 2023 WL 2706254, at *2, 4 (E.D.N.Y. Mar. 30, 2023) (declining to order inquest until "necessary"). The cases on which AFICA relies in seeking a midstream inquest are inapposite. *See Arch Specialty Ins. Co. v. Farm Fam. Cas. Ins. Co.*, 238 F. Supp. 3d 604, 616 (S.D.N.Y. 2017) (ordering inquest where additional insured submitted no more than an affidavit representing incurred cost and cost of defending on-going third-party action in dispute).